Filed 6/5/25  P. v. Jarmon CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C098895 |
| Plaintiff and Respondent, | (Super. Ct. No. 22FE000455) |
| v. | |
| TYRELL JARMON et al., | |
| Defendants and Appellants. | |

B.T. and M.L.[1] sold drugs out of their apartment in a gated apartment complex. The victim, B.T.'s brother, was staying with them in the apartment.  On December 7, 2021, the victim met defendants Tyrell Jarmon and Devonti Long at the entrance gate of the apartment complex, believing he was going to consummate a drug sale.  Defendants confronted the victim at the gate and marched him back into the apartment complex with his hands raised.  A third defendant, Kishawn Johnson, who is not a party to this appeal,

---

[1]    To protect their privacy, we refer to the witnesses by their initials.  (Cal. Rules of Court, rule 8.90(b)(11).)

1

followed them. As they neared the apartment, one of the defendants fatally shot the victim in the torso.

A jury found Jarmon and Long guilty of first degree felony murder and found true the special circumstance allegation that the murder was committed while defendants were engaged in the commission or attempted commission of a robbery. The jury found all three defendants guilty of the lesser included offense of attempted robbery. The trial court sentenced Jarmon and Long to life without the possibility of parole for felony murder and imposed and stayed sentences on the attempted robbery count.

On appeal, defendants argue the murder convictions and special circumstance true findings are not supported by substantial evidence. They also contend there was an instructional error with regard to the trial court's felony-murder instructions and that the prosecutor committed misconduct by misstating the law of felony murder. Lastly, defendants both argue that the court erred in failing to instruct the jury on second degree murder as a lesser included offense of first degree felony murder.

We will direct the abstracts of judgment corrected and affirm in all respects.

BACKGROUND

*Second Amended Information*

The second amended information charged Jarmon and Long in count one with murder. (Pen. Code, § 187, subd. (a).)[2] The information alleged the special circumstance that, in the commission of the murder, defendants were engaged in the commission of robbery (§ 190.2, subd. (a)(17)), and the sentence enhancement that, in the commission of the murder, defendants were armed with a firearm (§ 12022, subd. (a)(1)). The information charged Jarmon and Long in count two with robbery in the second degree (§ 211), and alleged that, in the commission of the robbery, defendants were armed with a

---

[2]     Further undesignated section references are to the Penal Code.

2

firearm (§ 12022, subd. (a)(1)).  In count three, the information charged Jarmon, Long, and Johnson with attempted robbery in the second degree (§§ 664, 211), and further alleged that in the commission of the attempted robbery, defendants were armed with a firearm (§ 12022, subd. (a)(1)).  The information alleged circumstances in aggravation as to both Jarmon (Cal. Rules of Court, rule 4.421(a)(8)) and Long (Cal. Rules of Court, rule 4.421(a)(8), (b)(2), (b)(3)).  The information alleged Long had been convicted of three prior serious felony convictions (§§ 667, subd. (a), 1192.7, subd. (c)), and that he came within the provisions of the "Three Strikes" law (§§ 667, subd. (b)-(i), 1170.12).

*Trial*

*The Shooting*

M.L. and B.T. lived in an apartment complex on Van Alstine Avenue in Carmichael.  They sold drugs out of the apartment.[3]  B.T. estimated that their operation had 500 to 600 customers.  In July 2021, the victim, B.T.'s brother, came to live in the apartment.  The victim would sometimes deliver drugs for M.L.

B.T. did not know Long or Jarmon.  However, he knew codefendant Johnson, who had been to the apartment more than 10 times to buy drugs.  B.T. and M.L. would talk about their business in front of Johnson.  Johnson had also seen them counting a large sum of money, nine to ten days before the homicide.

On December 7, 2021, (unless otherwise indicated, all events described occurred on this date), B.T. and M.L. drove home from Las Vegas.  Upon their return, before leaving the apartment to go to his girlfriend's house, B.T. observed that the victim was having a disagreement over text messages with someone who was late to make a drug purchase.

---

[3]     M.L. was granted use immunity.  However, he refused to testify at trial, and the trial court found him in contempt of court.

3

As B.T. was leaving the apartment complex, he saw S.R. and J.R., who frequently visited the apartment, pull up in S.R.'s vehicle. In a surveillance video, S.R.'s white Toyota RAV4 can be seen arriving at the apartment complex at approximately 9:50 p.m. S.R. and J.R. came to the apartment complex to buy marijuana. When they arrived at the apartment, M.L. and the victim were there. They all smoked marijuana and hung out for 15 to 20 minutes before the victim left the apartment. S.R. believed the victim was going downstairs to deliver drugs to someone.

After a couple of minutes, S.R. heard a gunshot nearby. S.R. and J.R. wheeled M.L., who was in a wheelchair, to his room, and then they ran to the bathroom and locked the door. After several minutes, S.R. heard knocking at the front door, and heard the victim yelling, "Help. Help. They shot me." According to S.R., he and J.R. helped the victim inside. S.R. and J.R. propped the victim up against a couch. Within five to ten minutes, the victim was completely unresponsive. S.R. and J.R. acknowledged they did not call 911. Nor did M.L.

M.L. suggested they leave as soon as possible because the assailants could return. M.L. took the elevator down, and S.R. and J.R. followed. M.L. told S.R. to return to the apartment to retrieve a shoebox, which he did. They all entered S.R.'s vehicle. Two or three minutes later, S.R. heard sirens, and law enforcement arrived. S.R. admitted he did not report to law enforcement that there was a gunshot victim upstairs in the apartment.

Deputies Austin Schraeder and Sean Woodward of the Sacramento County Sheriff's Office responded at 10:22 p.m. to the Van Alstine apartment complex following a report of shots fired. Deputy Schraeder saw a white Toyota RAV4 with M.L., J.R., and S.R. inside. Bystanders pointed at the vehicle and indicated that the occupants "were related to the incident." Deputies Schraeder and Woodward searched the occupants, but found no firearm. Officers also conducted a brief search of the vehicle, but, again, found no weapon. In a later, more comprehensive search of the RAV4, officers found $31,000 in cash and a large bag containing what appeared to be cocaine.

4

Meanwhile, while at his girlfriend's house, B.T. received a call from M.L. telling him that his brother had been shot. B.T. drove to the apartment complex and ran in. Responding to the apartment complex based on a report of shots fired, Deputy Andrew Durham encountered B.T., who was running towards the entrance. B.T. asked, frantically, "Is he dead?" B.T. gave Deputy Durham his key fob so he could access the stairwell and elevator.

Deputy Durham and two other deputies went to the second floor and approached the apartment. Inside, Deputy Durham observed the victim on the living room floor, propped up against a couch. He had sustained a gunshot wound to the lower abdomen. The victim was transported to a hospital where he was pronounced dead. The parties stipulated that the pathologist's autopsy findings indicated that the victim's cause of death was a gunshot wound to the torso.

In the apartment, law enforcement found a large amount of what appeared to be drugs, including marijuana, cocaine, Xanax, and psilocybin mushrooms, as well as a digital scale and $1,100 in cash. Deputy Durham testified that he could "assume that sometimes drug dealers are armed." Detective Brandon Wright testified that it would not be uncommon to find a firearm in such a drug operation, but none was found. S.R. and J.R. both testified that they had never seen a gun in the apartment.

Outside the apartment, Deputy Durham found a .40-caliber cartridge casing about 10 feet from the apartment door. He also observed a broken silver necklace on the floor in front of the elevator. B.T. testified it was the victim's chain.

Deputy Woodward took a statement from J.R. at the scene. J.R. said that he, S.R., and M.L. arrived at the apartment complex in S.R.'s car right before hearing a gunshot. He told Deputy Woodward they "were just chilling in the car" at the time. Deputy Woodward also interviewed S.R., whose statement was largely consistent with his trial testimony.

5

*Evidence from Cell Phone Records*

Reviewing the records of a cell phone associated with Jarmon, Detective Richard Hamilton found a text message exchange between Jarmon's cell phone and the victim's cell phone that occurred between 8:56 and 9:33 p.m. At 8:56 p.m., a text message from Jarmon's cell phone to the victim's cell phone said, "[y]ou online," which, according to Detective Hamilton, was a way of asking, "if you're available to sell." At 8:57 p.m., Jarmon's cell phone texted, "VVS gave me yo [*sic*] number"; VVS was a moniker associated with M.L. At 8:57 p.m., the victim's cell phone responded, "Yeah, what do you need?" and Jarmon's cell phone replied, "2 grams can you come to me?" At 9:04 p.m., the victim's cell phone supplied an address, and Jarmon's cell phone responded that he would be there in 15 minutes. At 9:15 p.m., the victim's cell phone texted that the price would be "80 a g," meaning $80 per gram. At 9:23 p.m., Jarmon's cell phone texted asking, "Can u meet me a little closer," and the victim's cell phone replied, "I'm not mobile till tomorrow g [*sic*] I've been drinking." At 9:25 p.m., Jarmon's cell phone responded that he would be there in five minutes. At 9:33 p.m., the victim's cell phone texted Jarmon's cell phone, "Wya," meaning "[W]here you at."

Having reviewed surveillance video from the Van Alstine apartment complex, discussed *post*, Detective Hamilton testified that, at the time this text exchange was taking place, some "parties of interest" were already at the apartment complex. Consistently, Detective Wright testified that two of the individuals who were present at the homicide could be seen on surveillance video at the apartment complex earlier in the night. The records of a cell phone associated with Long indicated that, at 9:13 p.m., one hour before the shooting, his cell phone received a call from codefendant Johnson's cell phone, and, at that time, Long's cell phone connected with a cell tower in or near the Van Alstine apartment complex. The same was true for another incoming call to Long's cell phone at 9:22 p.m.

6

Reviewing cell phone records associated with the victim's cell phone, Detective Hamilton saw that, at 10:10 p.m., approximately three minutes before the shooting, the victim's cell phone connected with Jarmon's cell phone for a call lasting 12 seconds. At that time, the victim can be seen on surveillance video at the apartment complex walking towards the entrance gate to meet defendants.

*Surveillance Video Evidence*

At approximately 5:45 p.m. on the day of the shooting, Long and Jarmon patronized a liquor store in Oakland, arriving in a Chevy Impala rental car. By 8:06 p.m., the Chevy Impala can be seen in surveillance video recorded at Johnson's apartment complex on Fair Oaks Boulevard in Sacramento. At 8:07 p.m., Long and Jarmon can both be seen walking in the parking lot of that apartment complex.

Next, at approximately 8:53 p.m., the Chevy Impala can be seen parking in a parking area at the Van Alstine apartment complex. No one emerges from the vehicle for more than 10 minutes, until Long and Jarmon get out at approximately 9:06 p.m., walk out of the frame, return to the vehicle approximately 10 minutes later, and drive away at 9:16 p.m. As stated, the text messages exchanged between Jarmon's cell phone and the victim's cell phone about the purported drug buy occurred between 8:56 and 9:33 p.m., and thus, during much of this time, Long and Jarmon were at the apartment complex.

The Chevy Impala is next seen on video at approximately 9:42 p.m., back at Johnson's apartment complex. At 9:46 p.m., Johnson's Lexus SUV can be seen driving in the parking lot, and the Chevy Impala turns to follow it. At 9:49 p.m., Johnson's Lexus SUV can be seen driving in the parking lot with the Chevy Impala following directly behind it. Surveillance video from a traffic camera at approximately 10:00 p.m. showed the Chevy Impala and Johnson's Lexus SUV driving, in tandem, in the direction of the Van Alstine apartment complex.

Detective Alex Zakrzewski obtained surveillance video from a liquor store near the Van Alstine apartment complex. At approximately 10:04 p.m., the Chevy Impala and

7

Johnson's Lexus SUV can be seen pulling into the parking lot. After the cars park, Johnson can be seen getting into the rear passenger seat of the Chevy Impala. At 10:07 p.m., the Chevy Impala leaves the parking lot and turns in the direction of the apartment complex.

Detective Wright described what appeared in the surveillance video clips recorded before, during, and after the shooting from a property adjacent to the apartment complex. The shooting itself occurred out of the frame. The video shows part of one apartment complex building, the driveway, a parking structure, and parked cars, the apartment complex's entrance gate, the street, and the opaque fence between the apartment complex and the adjacent property. The digital time on the surveillance recording was accurate. The parties do not dispute the identities of Jarmon, Long, Johnson, or the victim on the recording.

Just before 10:11 p.m., Johnson can be seen, walking or running outside of the apartment complex's entrance gate. He stops after passing where the entrance gate intersects with the opaque wooden fence separating the apartment complex and the adjacent property. As seen in exhibit 1-24, a still photograph, that opaque wooden fence extends toward the street, well beyond where it meets with the apartment complex entrance gate, so someone could hide behind that portion of the fence, unseen by persons inside the apartment complex's driveway.

As the recording continues, the victim appears on the lower right corner of the screen, coming from within the apartment complex, and walking towards the entrance gate. As he approaches the entrance gate, Johnson, on the other side of the wooden fence, appears to crouch down slightly. In the next clip, the victim continues walking toward the entrance gate while two individuals outside the complex, Jarmon and Long, approach the gate, where they meet the victim. Johnson remains behind the fence. The victim, Jarmon, and Long interact near the entrance gate for about 15 seconds. Then the victim, Jarmon, and Long walk together from the entrance gate towards the apartment from

8

where the victim came. Accompanied closely by Jarmon and Long, the victim can be seen walking with his hands raised in the air. The three continue towards the apartment building, the victim lowers his hands, and the three proceed out of the frame. Almost 40 seconds after Long and Jarmon began to lead the victim away, and after they exited the frame, Johnson, dressed all in red, comes around from behind the wooden fence, climbs over the entrance gate, and follows the other three.

The next clip begins with no one visible in the frame. Just over 30 seconds into the clip, at 10:13:52 p.m., there is a loud noise which, according to Detective Wright, sounded like a gunshot. Seconds later, Johnson can be seen fleeing out of the apartment complex. Jarmon can then be seen running across the parking lot toward the entrance gate. Meanwhile, after the gunshot, the victim's voice can be heard screaming. Some of the screams are unintelligible, but at one point, the victim yells out, "I'm hurt!" As the next clip begins, Jarmon and Long can be seen fleeing, one after the other, out of the apartment complex.

Almost two minutes elapsed between when defendants and the victim met at the entrance gate and when the lone gunshot can be heard. The last defendant fleeing the scene, Long, exits the frame at 10:14:14 p.m., approximately two minutes and 20 seconds after the encounter began at the entrance gate.

On another surveillance video, Long and Jarmon can be seen walking the victim up steps, around what appears to be S.R.'s vehicle, and toward the apartment. Detective Wright testified that, later in the video, he observed two individuals running from the area of the victim's apartment towards a staircase leading to the lower level. Long can be seen dropping something, stopping to pick it up, and then continuing to run down the stairs. This occurred at approximately 10:13 p.m.

At 10:15 p.m., back at the nearby liquor store, Johnson can be seen walking into the parking lot from the direction of the Van Alstine apartment complex. Within approximately one minute, the Lexus SUV can be seen exiting the parking lot.

9

Detective Wright emphasized that, although the victim was shot at 10:13 p.m. and he remained at the apartment complex until medical personnel transported him to the hospital, at 10:20 p.m., his cell phone began moving. Detective Wright believed the cell phone "moved from the crime scene and traveled to the area of Fair Oaks Boulevard and Eastern Avenue." A traffic camera video showed the Chevy Impala at the intersection of Watt Avenue and Fair Oaks Boulevard at 10:20 p.m. Detective Wright testified that if a car traveled along Fair Oaks Boulevard from Van Alstine Avenue, past Eastern Avenue, the car could end up at the intersection of Watt Avenue and Fair Oaks Boulevard. Law enforcement never found the victim's cell phone.

*Verdicts and Sentencing*

The jury found defendants guilty of first degree felony murder, and found true the allegation that a principal in the commission of the offense was armed with a firearm. The jury also found true the robbery-murder special-circumstance allegation. The jury found defendants and Johnson not guilty of robbery on count two, but found them guilty of the lesser included offense of attempted robbery. The jury also found true all circumstances in aggravation alleged

The trial court sentenced Jarmon to life without the possibility of parole on count one and one year for the firearm enhancement, and to the middle term of two years on count two plus one year for the firearm enhancement, with the sentences imposed on count two stayed. (§ 654.) The court sentenced Long to life without the possibility of parole on count one and one year for the firearm enhancement, and to 25 years to life on count two plus one year for the firearm enhancement, with the sentences on count two stayed. (§ 654.)

DISCUSSION

I

*Substantial Evidence of Felony Murder and the Special Circumstance*

A. *Defendants' Contentions*

Long argues that insufficient evidence supports the jury's determination on the felony-murder count and the special circumstance true finding. He argues that the evidence demonstrated that he only participated in an armed attempted robbery, which is legally insufficient to support a finding that he acted with reckless indifference to human life. Jarmon joins in Long's arguments. We will conclude that the jury's verdicts and special circumstance true findings are supported by substantial evidence.

B. *Standard of Review*

"The law governing sufficiency-of-the-evidence challenges is well established and applies both to convictions and special circumstance findings. [Citations.] In reviewing a claim for sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime or special circumstance beyond a reasonable doubt. We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt. [Citation.] We neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.] We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence." (*People v. Jennings* (2010) 50 Cal.4th 616, 638-639.) " 'A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142.)

C. *Felony Murder*

Murder committed in the perpetration or attempted perpetration of certain enumerated felonies, including robbery, constitutes first degree felony murder. (§ 189, subd. (a).) A participant in the perpetration or attempted perpetration of one of the enumerated felonies "in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life . . . ." (§ 189, subd. (e).) The felony-murder special circumstance statute includes the same culpability requirements as those found in section 189, subdivision (e). (See § 190.2, subds. (b)-(d).)

Both Long and Jarmon argue that substantial evidence does not support their guilty verdicts and special circumstance true findings on the theories that they each were the actual killer or that they each aided the actual killer with the intent to kill. Like the People in their briefing, we focus on the theory pursued at trial, that defendants both were major participants in the attempted armed robbery who acted with reckless indifference to human life.

D. *Major Participant in the Underlying Felony*

The People correctly observe that neither Long nor Jarmon challenges the premise that substantial evidence supports the conclusion that they were "major participants" in the underlying felony. Long acknowledges "he was directly involved in the attempted robbery," and proceeds directly to a discussion of reckless indifference. Jarmon states the culpability requirements to support a felony-murder guilty verdict and also focuses on reckless indifference.

Substantial evidence shows that Long and Jarmon spent hours together before the crime. They arrived at the apartment complex together. They confronted the victim

12

together at the entrance gate. They compelled the victim to walk into the apartment complex together. And, after one of them shot the victim, they fled together.

E. *Reckless Indifference to Human Life*

"Reckless indifference to human life has a subjective and an objective element. [Citation.] As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.] As to the objective element, ' "[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." ' [Citations.] 'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death" ' satisfies the statutory requirement. [Citation.] Notably, 'the fact a participant [or planner of] an armed robbery could anticipate lethal force might be used' is not sufficient to establish reckless indifference to human life." (*In re Scroggins* (2020) 9 Cal.5th 667, 677; accord, *People v. Banks* (2015) 61 Cal.4th 788, 808 (*Banks*).)

To determine whether a defendant acted with reckless indifference to human life, a reviewing court analyzes the totality of the circumstances. (*In re Scroggins, supra*, 9 Cal.5th at p. 677.) "Relevant factors include: Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony? [Citation.]

' "[N]o one of these considerations is necessary, nor is any one of them necessarily sufficient." ' " (*Ibid.*)

Here, defendants attempted an armed robbery against a drug seller. More than that, however, they confronted the victim at the apartment complex's closed entrance gate and forced him into the apartment complex and up to the second floor, where M.L.'s and B.T.'s apartment was located. Johnson, defendants' codefendant at trial, was a patron of the drug operation who had visited the apartment more than 10 times to buy drugs. B.T. and M.L. had talked about their business in front of him, and days before the shooting, Johnson had seen them counting a large amount of money. The victim was shot within feet of the apartment door, near which law enforcement found the victim's necklace and a cartridge casing. The jury could reasonably infer that the defendants intended not merely to rob the victim, but to steal from the apartment and rob any occupants. Otherwise, there would be no reason to force the victim toward the second-floor apartment. In fact, both defendants in their briefing concede that the evidence supports an inference that they intended to rob the drug dealers in the apartment.

Turning to the factual considerations highlighted by the Supreme Court (see *In re Scroggins, supra*, 9 Cal.5th at p. 677), we first address whether defendants used or knew that a gun would be used during the felony. Long repeatedly argues that he was unarmed, and that it was Jarmon who had the firearm. There is no evidence establishing that Long was unarmed. In any event, under the relevant analysis, we need not decide whether it was Jarmon who brandished the firearm, as Long argues, or address his arguments concerning whether surveillance video establishes who was armed. One of the defendants used a gun. The victim died from a gunshot wound to the torso, and a .40-caliber cartridge casing was found at the scene. Furthermore, even if one of the defendants was unarmed, the jury reasonably could have inferred that that particular defendant knew that a gun would be used during the intended robbery. Again, defendants intended to rob a drug seller, and they intended to steal from the apartment and rob

14

anyone in it, including the drug dealers themselves. The jury could reasonably infer that, even if one of the defendants was unarmed, he knew his companion would bring a firearm under these circumstances. It strains credulity to suggest that, not only was one of the defendants unarmed, but that he did not know that a gun would be used in the attempt to rob the victim, force him up to the apartment, and rob whoever happened to be present in the drug dealers' apartment.

With regard to how many weapons were used, it may be that both defendants were armed. But we may not speculate since "[s]peculation is not substantial evidence." (*People v. Ramon* (2009) 175 Cal.App.4th 843, 851.) Substantial evidence, however, supports the conclusion that at least one firearm was used in the attempted robbery.

Both defendants were physically present at the crime. The surveillance videos demonstrate that, at all relevant times, both defendants were in the immediate presence of each other and the victim. Both defendants thus would have had the opportunity to "restrain the crime." (*In re Scroggins, supra*, 9 Cal.5th at p. 677.) Either defendant could have encouraged flight rather than resort to gunfire. And if one of the defendants was unarmed, that defendant could have attempted to restrain the shooter. We recognize that the reality of the situation may have included the victim suddenly resisting and matters escalating quickly. However, given the roughly two minutes between when defendants met the victim at the entrance gate and when one of them shot the victim, we conclude each defendant had the opportunity to restrain the crime by, for example, urging his codefendant to abandon the undertaking.

Following the shooting, neither defendant exercised the opportunity to aid the victim by summoning medical assistance. (See *In re Harper* (2022) 76 Cal.App.5th 450, 465 [after hearing a gunshot fired by his confederate, the petitioner did nothing to aid the victim].) Although a defendant's actions after a shooting may not always be probative of their mental state (see *In re Scroggins, supra*, 9 Cal.5th at pp. 679-680; *In re Taylor* (2019) 34 Cal.App.5th 543, 559-560), defendants' flight and failure to render aid were

15

factors the jury could consider (see *Tison v. Arizona* (1987) 481 U.S. 137, 141; *People v. Bradley* (2021) 65 Cal.App.5th 1022, 1034).

Defendants also heightened the risks inherent in the crime. Approximately two minutes elapsed between when defendants and the victim met at the entrance gate and when the gunshot could be heard. This was substantially longer than the interaction could have been had defendants chosen merely to rob the victim at the gate. Instead, they forced him towards the apartment, apparently with the intent to rob anyone inside. Escorting the victim from the entrance gate took time, time defendants deemed worthwhile to gain the bounty of what was in the apartment. This plainly heightened the risk.

There is little evidence in the record to establish either defendant's knowledge of his confederate's propensity for violence or the likelihood of using lethal force. Defendants spent hours together before the shooting, including time at the apartment complex, presumably planning their crime. It seems reasonable to infer, based on this time together and its purpose, that defendants would each be aware of the other's background, propensity for violence, and the likelihood that lethal force might be used. However, on this record, we conclude that this would be speculation.

There is no evidence that either defendant took any steps to minimize the risks of violence during the felony.

In addition to the factual circumstances outlined by the Supreme Court, we emphasize additional factors here. First, as stated, it would have been reasonable for the jury to infer that defendants intended not merely to rob the victim, but to steal from the apartment and rob its occupants. Defendants had knowingly set up a drug buy from the victim, presumably as a pretext. And, based on their affiliation with Johnson, defendants knew M.L. and B.T. were dealers with a significant drug trade operating out of the apartment. Under these circumstances, it is reasonable to infer that defendants knew they could face armed resistance. Jarmon argues that there was no evidence he or his

16

confederates knew the extent of the drug operation and that there was no evidence codefendant Johnson had seen guns at the apartment. However, case law, and common sense, support the premise that defendants, intending to rob one or more drug dealers, would have known they could face armed resistance. (See *People v. Bland* (1995) 10 Cal.4th 991, 1005 ["Drug dealers are known to keep guns to protect not only themselves, but also their drugs and drug proceeds"]; *People v. Gallegos* (2002) 96 Cal.App.4th 612, 629 [same]; see also *People v. Glaser* (1995) 11 Cal.4th 354, 367 [firearms are " ' "tools of the trade" ' " in narcotics business]; *People v. Bradford* (1995) 38 Cal.App.4th 1733, 1739 ["it is common knowledge that perpetrators of narcotics offenses keep weapons available to guard their contraband"].) Defendants' knowing choice to target and attempt to rob individuals reasonably likely to be armed substantially heightened the risk of danger, escalating it from a "garden variety" armed robbery to one involving a grave risk of deadly violence.

Jarmon suggests that, if the circumstances in *Banks* were not sufficient to establish reckless indifference to human life, then they were not here either. Jarmon emphasizes that, in *Banks*, the defendants attempted to rob a medical marijuana dispensary which had a sally port, security cameras, and a security guard, and argues that the Supreme Court in *Banks* "did not draw any inferences favorable to a finding of reckless indifference from those facts." Jarmon elides from his consideration of *Banks* the following: The security guard's "coworkers testified they believed he was an unarmed guard, and there was no evidence [the defendant] believed otherwise, or even that he knew a guard would be present. Because nothing in the record reflects that [the defendant] knew there would be a likelihood of resistance and the need to meet that resistance with lethal force, the evidence failed to show [the defendant] 'knowingly engag[ed] in criminal activities known to carry a grave risk of death.' " (*Banks, supra*, 61 Cal.4th at p. 811.) Conversely, here, we have concluded it could properly be inferred that both defendants knew they were going to attempt to rob drug dealers who might be armed. Moreover, the defendant

in *Banks* merely served as the getaway driver for the armed robbery, contributing to the Supreme Court's conclusion that he was no more culpable than the getaway driver in *Enmund v. Florida* (1982) 458 U.S. 782, who defined the contours at the least culpable end of the *Enmund-Tison* continuum (*Banks,* at p. 794). Here, both defendants were directly, physically involved in the attempted robbery.

Additionally, we consider the setting for the crime. Defendants met the victim at the entrance to a very large, four-building apartment complex, walked him across the driveway and to one of the buildings, and upstairs, toward his apartment. These well-populated surroundings further increased the risk of violence.

Considering the record and the totality of the circumstances in the light most favorable to the judgment (*People v. Jennings, supra*, 50 Cal.4th at p. 638), we conclude substantial evidence supports the conclusion that defendants acted with reckless indifference to human life by knowingly creating a grave risk of death in their commission of the attempted robbery. We cannot say that " ' " 'upon no hypothesis whatever is there sufficient substantial evidence to support' " ' " the jury's verdicts and special circumstance true findings. (*People v. Penunuri, supra*, 5 Cal.5th at p. 142.)

II

*Instructional Error*

A. *Additional Background*

The trial court instructed the jurors with the following instructions, reproduced insofar as relevant to defendants' contentions here.

*CALCRIM No. 540A*

"The defendants Tyrell Jarmon and Devonti Long are charged in Count 1 with murder, under a theory of first degree felony murder. [¶] To prove that the defendant is guilty of first degree murder under this theory, the People must prove that: [¶] 1. The defendant committed or attempted to commit a robbery; [¶] 2. The defendant intended

18

to commit a robbery [¶] AND [¶] 3. While committing or attempting to commit a robbery, *the defendant caused the death of another person*." (Italics added.)

*CALCRIM No. 540B*

"Defendants Tyrell Jarmon and Devonti Long are charged in Count One with murder, under a theory of First Degree Felony Murder. [¶] A defendant may also be guilty of murder, under a theory of felony murder, even if another person did the act that resulted in the death. I will call the other person the *perpetrator*. [¶] To prove that a defendant is guilty of first-degree murder under this theory, the People must prove that: [¶] 1. The defendant committed or attempted to commit, or aided and abetted, a robbery or attempted robbery; [¶] 2. The defendant intended to commit, or intended to aid and abet the perpetrator in committing robbery [¶] 3. If the defendant did not personally commit or attempt to commit robbery then a perpetrator, whom the defendant was aiding and abetting, committed or attempted to commit robbery; [¶] 4. While committing or attempting to commit a robbery *the perpetrator caused the death of another person*; [¶] AND [¶] The defendant was a major participant in the robbery or attempted robbery; AND [¶] When the defendant participated in the robbery or attempted robbery, he acted with reckless indifference to human life. [¶] . . . [¶] You may not find the defendant guilty of felony murder unless all of you agree that the defendant or a perpetrator *caused the death of another*. You do not all need to agree, however, whether the defendant or a perpetrator caused that death." (Italics added.)

*CALCRIM No. 703*

"If you decide that a defendant is guilty of first degree murder but was not the actual killer, then, when you consider the **Special Circumstance** of whether the murder was committed during commission of a robbery or attempted robbery, you must also decide whether the defendant acted either with **intent to kill or with reckless indifference to human life**. [¶] In order to prove this Special Circumstance for a defendant who is not the actual killer but who is guilty of first degree murder as an aider

and abettor, the People must prove either that the defendant intended to kill, or the People must prove all of the following: [¶] 1. The defendant's participation in the crime began before or during the killing; [¶] 2. The defendant was a major participant in the crime; [¶] AND [¶] 3. When the defendant participated in the crime, he acted with reckless indifference to human life. [¶] . . . [¶] . . . [¶] If the defendant was not the actual killer, then the People have the burden of proving beyond a reasonable doubt that he acted with either the intent to kill or with reckless indifference to human life and was a major participant in the crime for the Special Circumstance of murder during the commission of a robbery or attempted robbery to be true."

*CALCRIM No. 730*

"The defendants, Tyrell Jarmon and Devonti Long, are charged with the Special Circumstance of murder committed while engaged in the commission of a robbery, or attempted robbery. [¶] To prove that this Special Circumstance is true, the People must prove that: [¶] 1. The defendant committed or attempted to commit, or aided and abetted a robbery [¶] 2. The defendant intended to commit, or intended to aid and abet the perpetrator in committing, a robbery [¶] 3. If the defendant did not personally commit or attempt to commit a robbery, then a perpetrator, whom the defendant was aiding and abetting before or during the killing, personally committed or attempted to commit a robbery. [¶] AND [¶] Either Tyrell Jarmon or Devonti Long *did an act that caused the death of another person*. [¶] . . . [¶] In addition, in order for this special circumstance to be true, the People must prove that the defendant intended to commit a robbery independent of the killing. If you find that the defendant only intended to commit murder and the commission of a robbery was merely part of or incidental to the commission of that murder, then the Special Circumstance has not been proved." (Italics added.)

B. *Defendants' Contentions*

Long argues that CALCRIM Nos. 540A, 540B, and 730 permitted the jurors to find him guilty of felony murder and find true the robbery-murder special-circumstance

allegation based on a legally invalid theory. According to Long, the law requires a finding that the perpetrator personally killed the victim or, in other words, was the actual killer. The phrase in the instructions " 'caused the death of another,' " however, described proximate cause, a standard that does not properly limit liability. Jarmon joins Long, advancing the same arguments in his briefing. Following applicable case law, we agree the instructions were erroneous. However, we conclude the error was harmless beyond a reasonable doubt.

C. *Forfeiture*

" 'A trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal.' [Citation.] 'But that rule does not apply when . . . the trial court gives an instruction that is an incorrect statement of the law.' " (*People v. Garcia* (2020) 46 Cal.App.5th 123, 154 (*Garcia*).) Defendants' primary argument is that the trial court instructed the jury with a legally invalid theory. As such, they have not forfeited their contention as the People claim. (*Ibid*. [same argument not forfeited because the instruction was an incorrect statement of law].)

D. *Analysis*

"An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law. [Citation.] In reviewing a claim of instructional error, the court must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution. [Citations.] The challenged instruction is viewed 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)

21

Several cases have addressed the claimed instructional error defendants raise here. In *Garcia, supra*, 46 Cal.App.5th 123, the jury was instructed with CALCRIM No. 730 on the robbery murder special circumstance, including the requirement that the People prove that the defendant "did an act that caused the death of another person." (*Garcia,* at pp. 149-150.) The defendant argued on appeal that CALCRIM No. 730 "failed to properly limit the special circumstance liability to a defendant who actually killed," and the appellate court agreed. (*Garcia,* at p. 150.) The court found "the California Supreme Court has used the term 'personally killed' when describing liability of an 'actual killer' for the felony-murder special circumstance," and " '[p]roximately causing and personally inflicting harm are two different things.' " (*Id*. at p. 151.) The Court of Appeal concluded that "the meaning of 'actual killer' under section 190.2[, subdivision] (b) is literal. The actual killer is the person who personally kills the victim . . . ." (*Id*. at p. 152.) The court concluded that the instruction's language was based on a theory contrary to law and constituted legal error. (*Id*. at p. 155.)

In *People v. Lopez* (2022) 78 Cal.App.5th 1, the jury found the defendant guilty of first degree murder and found true a robbery-murder special-circumstance allegation. (*Id*. at p. 10.) In relevant part, the court concluded that "the term 'actual killer' as used in the revised felony-murder rule of section 189, subdivision (e)(1) refers to someone who personally killed the victim and is not necessarily the same as a person who 'caused' the victim's death." (*Id*. at p. 4.) Based on the jury instructions, "the jury necessarily found that defendant 'caused the death of another person' and 'did an act that caused the death of another person,' " but "for defendant to be liable for felony murder under section 189[, subdivision ](e), based on the prosecution's theory and the instructions given, defendant would have to have been the 'actual killer.' " (*Id*. at p. 16.) Like the court in *Garcia*, the *Lopez* court found that "actual killer" means "personally killed." (*Id*. at pp. 16-17.)

22

The issue again arose in *People v. Vang* (2022) 82 Cal.App.5th 64. In *Vang*, a different panel of this court concluded that, in "light of Senate Bill No. 1437's intent to impose punishment commensurate with the person's culpability, . . . the term 'actual killer' was intended to limit liability for felony murder—in cases where section 189, subdivision (e)(2) or (3) do not apply—to the actual perpetrator of the killing, i.e., the person (or persons) who personally committed the homicidal act." (*Id*. at p. 88.) The court further concluded: "The jury instructions here have the same flaw as those in *Garcia*. They allowed the jury to find defendant guilty of felony murder, and to find the special circumstance true, if it determined that defendant 'caused' [the victim's] death based on general causation principles, even if it did not find, beyond a reasonable doubt, that he personally committed the homicidal act. The instructions were inadequate because jurors were not provided a proper definition of 'actual killer.' " (*Id*. at p. 91.)

We see no reason to depart from the conclusions in *Garcia*, *Lopez*, and *Vang*. The People have not offered any persuasive argument on this point. In fact, the People have failed altogether to address this line of cases.

Here the instructions allowed the jury to find each defendant guilty of first degree felony murder, and to find true the robbery-murder special-circumstance allegation, upon a finding that the defendant, or the perpetrator, " 'caused the death of another person' " (CALCRIM Nos. 540A, 540B, 730) rather than requiring the jury to find that the perpetrator personally killed the victim. This was legal error. (*People v. Vang, supra*, 82 Cal.App.5th at p. 91; *Garcia, supra*, 46 Cal.App.5th at p. 155.)

E.  *Prejudice*

"Where, as here, the verdict was based on a legally invalid theory, reversal is required unless we can say, beyond a reasonable doubt, that the error did not contribute to the verdict." (*People v. Vang, supra*, 82 Cal.App.5th at p. 91; see *Chapman v. California* (1967) 386 U.S. 18, 24; see also *People v. Reese* (2017) 2 Cal.5th 660, 671.) Here, we can say beyond a reasonable doubt that the error did not contribute to the verdict.

23

The victim died from a single gunshot wound to the torso. Only one gunshot can be heard on the surveillance recording before defendants fled the scene. One expended cartridge casing was discovered at the scene. The jury found true that a principal in the commission of the murder—Long or Jarmon—was armed with a firearm. Johnson was not present when defendants initially led the victim away, seemingly at gunpoint, was not charged with the murder, and was not one of the defendants found to be armed under the firearm enhancement attached to count one.

Defendants were tried only under the theory that they were each a major participant in the underlying felony who acted with reckless indifference to human life. The prosecution did not attempt to prove the identity of the actual killer or that either defendant, with the intent to kill, aided the actual killer in the commission of murder.

Of course, one of the defendants was the actual killer. But the evidentiary circumstances of this case made it difficult, if not impossible, to determinate which of them personally killed the victim. However, "the jury need not decide unanimously whether a defendant was a direct perpetrator or an aider and abettor, so long as it is unanimous that he was one or the other." (*People v. Wilson* (2008) 44 Cal.4th 758, 801.) " 'Sometimes . . . the jury simply cannot decide beyond a reasonable doubt exactly who did what. There may be a reasonable doubt that the defendant was the direct perpetrator, and a similar doubt that he was the aider and abettor, but no such doubt that he was one or the other.' " (*People v. Smith* (2014) 60 Cal.4th 603, 618.) The jury must unanimously agree on the guilt of a murder. (*Ibid*.) "But additional unanimity is not required. [Citation.] 'Once the discrete event is identified, for example, the killing of a particular human being, the theory each individual juror uses to conclude the defendant is criminally responsible need not be the same and, indeed, may be contradictory.' [Citation.] It suffices if the jury unanimously agrees that the prosecution has proven beyond a reasonable doubt every element necessary to establish guilt of a discrete crime." (*Ibid*.)

The instructions here erroneously stated that, to find defendants guilty, the jurors had to find that the defendant or a perpetrator " 'caused the death of another person.' " (CALCRIM Nos. 540A, 540B.)  Additionally, as argued by defendants, the prosecutor expressly relied on this legally invalid theory in repeatedly emphasizing the language invoking proximate causation.  (See *Garcia, supra*, 46 Cal.App.5th at p. 156 [prosecutor expressly relied on invalid legal theory].)

Nevertheless, under the facts of this case, the instructional error could not have made any meaningful difference.  There are no facts based on which the jury could have concluded, as it did, that the perpetrator *caused the death of the victim*, that did not *also* constitute the perpetrator *personally killing* the victim.  Put another way, there would be no way for the jury to conclude that, while the perpetrator caused the victim's death by the gunshot to the torso, the perpetrator did not also personally kill the victim with that shot.  And there was no evidence of a shooter other than Long or Jarmon.

Although the jury may not have been able to " 'decide beyond a reasonable doubt exactly who did what,' " it was not required to do so.  (*People v. Smith, supra*, 60 Cal.4th 618.)  The jury's verdict would not have differed if the trial court instructed the jury that it must find that the defendant, or the perpetrator, "personally killed another person" rather than "caused the death of another person."  This analysis applies with equal force to the robbery murder special circumstance and CALCRIM No. 730.

There is no reasonable possibility that these instructional errors contributed to the verdict.  (See generally *People v. Reese, supra*, 2 Cal.5th at p. 671.)

F.  *Additional Claims of Instructional Error*

Long makes additional instructional error claims under his primary argument.  He argues that CALCRIM No. 540B's definition of "reckless indifference" was "incomplete," and that " 'reckless indifference' requires further definition."  However, as Long acknowledges, the definition of reckless indifference in CALCRIM No. 540B was an accurate statement of law.  (*People v. Superior Court of Santa Barbara County* (2025)

25

107 Cal.App.5th 1268, 1279.) Long also argues, quoting language from *Banks*, that the trial court should have instructed the jurors to assess the defendant's personal role in the crimes leading to the victim's death. *Banks* was not a case addressing jury instructions. (*Banks, supra*, 61 Cal.4th 788.) In any event, CALCRIM No. 540B included numerous factors for the jury to consider in assessing reckless indifference that directly addressed the defendant's role and culpability. Long's contention is without merit.

Long also claims that there was not substantial evidence supporting the CALCRIM No. 540A felony-murder instruction that the jury could find him guilty as the actual killer. Substantial evidence to support a jury instruction " 'is evidence sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.' " (*People v. Kanawyer* (2003) 113 Cal.App.4th 1233, 1243.) One of the two defendants shot and killed the victim. Long and Jarmon can both be seen compelling the victim to go into the apartment complex seemingly at gunpoint, although it is not clear who was armed. Immediately after the shooting, as he flees from the apartment, Long can be seen stopping to pick something up that he dropped. We conclude that substantial evidence supported the instruction.

Lastly, Long argues that CALCRIM No. 703 was unclear because it "did not specify that the defendant must have aided and abetted *murder*, the jury could have interpreted the instruction to mean he could be convicted of murder for aiding and abetting *attempted robbery*." We disagree. A true finding on the special circumstance can be based on, among other things, a defendant, not the actual killer, with reckless indifference to human life and as a major participant, aiding and abetting *the commission of an enumerated felony* which results in death. (§ 190.2, subd. (d).) CALCRIM No. 703's references to the "crime" correctly refer to the underlying felony. CALCRIM No. 703 distinguishes between the crime and the homicide, reciting, for example, that the "defendant's participation *in the crime* began before or during *the killing*." (CALCRIM No. 703, italics added.) The instruction also directs the jury to consider, in deciding

26

whether defendant was a major participant, the defendant's "role in planning the crime that led to the death." (CALCRIM No. 703.) This is obviously a reference to *the underlying crime*, not to the resulting homicide, which may not have been planned. Even if there were any ambiguity, it would be resolved by reference to CALCRIM No. 730. (See *People v. Lemcke* (2021) 11 Cal.5th 644, 655 [jury instruction not considered in isolation but in the context of the instructions as a whole].) That instruction discusses the robbery murder special circumstance and specifically addresses finding a defendant committed, attempted, or aided and abetted "a robbery" as opposed to "the crime." (CALCRIM No. 730.)

## III

### *Prosecutorial Misconduct and Ineffective Assistance of Counsel*

Jarmon argues the prosecutor committed misconduct by misstating the law of felony murder. Specifically, Jarmon faults the prosecutor for (1) suggesting defendants could be jointly liable for each other's actions, (2) urging the jurors to find defendants guilty based on a "domino" or proximate cause theory of felony murder, (3) stating the jury could find defendants guilty if either of them "was aware of the risk of life,"(4) judging the gravity of the risk from the victim's perspective, and (5) suggesting that the reckless indifference standard was satisfied by mere awareness of the possibility of death. Long joins in these arguments.

" 'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such " 'unfairness as to make the resulting conviction a denial of due process.' " [Citations.] Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial.' " (*People v. Parson* (2008) 44 Cal.4th 332, 359.)

To preserve a claim of prosecutorial misconduct, a "defendant must generally object 'in a timely fashion—and on the same ground,' and must 'request[] that the jury be

admonished to disregard the impropriety.' " (*People v. Miranda-Guerrero* (2022) 14 Cal.5th 1, 29.) As Jarmon acknowledges, his attorney did not object to the alleged instances of misconduct. Thus, he has forfeited his contentions.

Turning to defendant's alternative contention, to prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced the defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 691-692; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217.) To demonstrate prejudice, a defendant must show a reasonable probability that the defendant would have achieved a more favorable result had counsel's performance not been deficient. (*Strickland,* at pp. 693-694; *Ledesma,* at pp. 217-218.)

One of Jarmon's claims of prosecutorial misconduct—the prosecutor's repeated statements that the jury could find defendants guilty based on a "domino" or proximate cause theory of felony murder—essentially consists of the prosecutor's emphasis and recharacterization of the legally erroneous instruction discussed in part II, *ante*. Given our conclusion that the erroneous instruction was harmless beyond a reasonable doubt, it is even clearer that the prosecutor's remarks were harmless under the lesser standard for prejudice applicable to a claim of ineffective assistance of counsel. There is not a reasonable probability that defendants would have achieved a more favorable result had defendants' trial attorneys objected to the prosecutor emphasizing the same standard.

Jarmon's remaining claims relate to the prosecutor's purported misstatements of the law. Jarmon offers no particularized analysis as to how he was prejudiced by each instance of alleged misconduct, or by the cumulative effect of the prosecutor's arguments. In any event, the prosecutor's misstatements were minor and fleeting. And, crucially, the trial court instructed the jurors that they "must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." (CALCRIM No. 200.) "The

28

jury is presumed to have followed the trial court's instructions in the absence of any indication it was unwilling or unable to do so." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 196.)

Jarmon relies on *People v. Centeno* (2014) 60 Cal.4th 659, but the circumstances of that case are not at all like those here. In *Centeno*, the Supreme Court stated that the prosecutor "repeatedly suggested that the jury could *find defendant guilty* based on a 'reasonable' account of the evidence. These remarks clearly diluted the People's burden" of proof beyond a reasonable doubt. (*Id.* at p. 673.) *Centeno* is distinguishable on numerous grounds. First, *Centeno* addressed the fundamental issue of the dilution of the prosecution's burden of proof beyond a reasonable doubt. Second, in *Centeno*, the prosecutor's dilution of the burden of proof "came in rebuttal, [and] defense counsel had no opportunity to counter it with argument of his own." (*Id.* at p. 676.) Here, the prosecutor's challenged remarks were not "the last word on the subject" (*id.* at p. 677), because he made the remarks in his initial closing argument. Lastly, *Centeno* "was a very close case," as the People conceded. (*Ibid.*) This case, on the other hand, is not.

Even if trial counsels' performances were deficient, there is not a reasonable probability that defendants would have achieved a more favorable result had their attorneys objected to the prosecutor's remarks.

IV

*Failure to Instruct on Lesser Included Offense*

Jarmon argues, and Long joins in the argument, that the trial court's failure to instruct on the lesser-included offense of second degree murder requires reversal. We disagree.

" ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are

29

necessary for the jury's understanding of the case." [Citation.] That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged.' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154, disapproved on another ground in *People v. Schuller* (2023) 15 Cal.5th 237, 260, fn. 7.) The trial court is required to instruct on a lesser included offense "whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury." (*Breverman,* at p. 162.)

Our Supreme Court has not yet decided the question of whether second degree murder is a lesser included offense of first degree felony murder. (*People v. Westerfield* (2019) 6 Cal.5th 632, 717; *People v. Taylor* (2010) 48 Cal.4th 574, 623.) Ultimately, we need not analyze that issue here. We conclude that, even if second degree murder is a lesser included offense, and even if an instruction on that offense was supported by substantial evidence, the failure to give the instruction was harmless.

We assess prejudice based on a trial court's failure to instruct the jury on a lesser included offense supported by substantial evidence under the *People v. Watson* (1956) 46 Cal.2d 818, state law standard for error. (*People v. Gonzalez* (2018) 5 Cal.5th 186, 196, 198, 201.) Jarmon suggests that *People v. Schuller, supra*, 15 Cal.5th 237, changed or called into question the applicable standard as stated in *Gonzalez*. However, *Schuller* addressed the trial court's error in denying the defendant's request for an instruction on imperfect self-defense and whether that error amounted to constitutional error. (*Id*. at p. 243.) The Supreme Court in *Schuller* noted that, in *Gonzalez*, it did not address a theory of federal constitutional error discussed by one of the dissenting Justices in *Breverman*. (*Id*. at pp. 256-257; see *People v. Breverman, supra*, 19 Cal.4th at pp. 187, 189-191 [dis. opn. of Kennard, J.].) However, the Supreme Court further stated: "Indeed, it does not appear that theory would have had any relevance to the type of error

30

at issue in *Gonzalez* because the omitted instructions in that case—lesser forms of homicide—did not operate to negate or otherwise modify the elements of the charged offense of felony murder, which does not require a showing of malice." (*Schuller,* at pp. 256-257.) " 'It is axiomatic that cases are not authority for propositions not considered.' " (*People v. Avila* (2006) 38 Cal.4th 491, 566.)  We follow *Gonzalez* and apply the *Watson* standard for state law error.  Under *Watson*, " 'a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 955.)

" 'Second degree murder is the unlawful killing of a human being with malice, but without the additional elements . . . that would support a conviction of first degree murder. [Citations.]' [Citation.]  Malice may be express or implied. [Citation.]  Malice will be implied 'when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " (*People v. Taylor, supra*, 48 Cal.4th at pp. 623-624.)

Here, the evidence established that M.L. and B.T. sold drugs out of their apartment and had hundreds of customers.  Codefendant Johnson knew about this business, had been to the apartment repeatedly to purchase drugs, B.T. and M.L. talked about their business in front of him, and, nine to ten days before the homicide, Johnson saw them counting a large amount of money.  Both defendants concede that the evidence supports an inference that they intended to rob the drug dealers in the apartment.

In the time before the shooting, Long and Jarmon went to Johnson's apartment complex, went to the Van Alstine apartment complex for approximately 20 minutes, presumably to plan their robbery, returned to Johnson's apartment complex, and then left, following Johnson's car to the liquor store near the Van Alstine apartment complex, where Johnson exited his car and joined Long and Jarmon in the Chevy Impala.

31

Johnson, Long, and Jarmon approached the Van Alstine apartment complex on foot. Long and Jarmon met the victim at the entrance gate, while Johnson remained concealed. The victim, Jarmon, and Long interacted at the gate for about 15 seconds, and then the victim, Jarmon, and Long walked together into the apartment complex, the victim with his hands raised in the air. Johnson later emerged from hiding, climbed over the entrance gate, and followed the others. Less than a minute later, one of the defendants fatally shot the victim.

Outside of the apartment, law enforcement found a single cartridge casing and the victim's silver necklace on the ground. In the apartment, law enforcement found a large amount of drugs, a digital scale, and $1,100 in cash. Additionally, the shoebox M.L. had S.R. retrieve as they fled the apartment contained more than $31,000 in cash and a large bag of cocaine.

Cell phone records established that, prior to these events, Jarmon exchanged a number of text messages with the victim, purporting to set up a drug buy. During a portion of the exchange, Jarmon and Long were actually in the apartment complex, but did not disclose this to the victim.

As we have concluded, this constituted legally sufficient evidence to support defendants' convictions of first degree felony murder. The jury also found all three defendants guilty of attempted robbery. We conclude that it is not reasonably probable that, had the jury also been instructed on second degree murder, the jury would have found defendants guilty of second degree murder rather than first degree felony murder.

In *People v. Banks* (2014) 59 Cal.4th 1113, disapproved on another ground in *People v. Scott* (2015) 61 Cal.4th at pages 363 and 391, footnote 3, the Supreme Court concluded that, although the trial court erred in failing to instruct on second degree murder, the error was harmless. (*Banks*, at p. 1161.) There was "no reasonable probability that the evidence of an argument between defendant and [the victim], minimal as it was, would have led the jury, had it been properly instructed, to conclude that

32

defendant shot [the victim] at the ATM out of malice unrelated to any robbery." (*Ibid*.) Here, by the even greater force of reason, where there is a great deal of evidence supporting the attempted robbery felony-murder theory, and no evidence supporting any argument theory or other basis for malice, there is no reasonable probability the jury would have concluded defendants shot the victim out of malice, unrelated to any attempted robbery, and that they were therefore guilty of second degree murder rather than first degree felony murder.

"To demonstrate error, appellant must present meaningful legal analysis supported by . . . citations to facts in the record that support the claim of error." (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.) Jarmon does not identify any evidence that would support the conclusion that defendants could be convicted of second degree murder but not first degree felony murder. Instead, he only notes that the "conscious disregard" standard applicable to second degree murder is a lower one than the "reckless indifference" standard. He argues, without any reference to facts in the record, that the "jury could have concluded" that he only harbored "the less culpable mental state of conscious disregard for human life." He argues that a jury "faced with an all-or-nothing choice between felony murder and acquittal will convict the defendant of murder, even though the prosecution may have failed to prove this crime." However, what he does not do is guide us to evidence to support his claims.

Jarmon argues that, where no additional findings are required to reach a true finding on the robbery-murder special circumstance beyond what is required for a guilty verdict on the felony-murder count, that true finding does not render the error in failing to instruct harmless. (See *People v. Gonzalez, supra*, 5 Cal.5th at pp. 191, 206, fn. 6 [robbery-murder special-circumstance true finding rendered error in failing to instruct on murder with malice aforethought or lesser included offenses harmless; however, "[w]e express no opinion as to whether this conclusion would apply in cases where the special circumstance finding does not require findings in addition to those necessary for a felony-

33

murder conviction . . . ."].)  We would agree with Jarmon only insofar as stating that we cannot find the error harmless *based only on the special circumstance true finding*. However, we do not base our conclusion on that true finding.

Any error in not instructing the jury on second degree murder was harmless.

V

*Abstracts of Judgment*

Defendants' abstracts of judgment erroneously state that the sentences imposed on the attempted robbery counts, and the associated firearm enhancements, were imposed on count three.  However, count three was dismissed, and the jury found defendants guilty of attempted robbery on count two as a lesser offense to the robbery charged in that count. We shall order the abstracts corrected to reflect that defendants were convicted on count two.

DISPOSITION

The judgment is affirmed.  The trial court is directed to prepare amended abstracts of judgment reflecting that defendants were convicted of attempted robbery and sentenced on count two, not count three, and to forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.


_____\s\_____,
                    Krause, J.



We concur:


_____\s\_____,
Mauro, Acting P. J.


_____\s\_____,
Boulware Eurie, J.